J-A18018-25          2026 PA Super 61

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
LAMAR JAMES CLAYBORNE :
:
Appellant : No. 2169 EDA 2024

Appeal from the Judgment of Sentence Entered August 9, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0001033-2020

BEFORE:  OLSON, J., DUBOW, J., and BECK, J.

OPINION BY BECK, J.:                                    **FILED MARCH 27, 2026**

Lamar James Clayborne ("Clayborne") appeals from the judgment of

sentence of total confinement imposed by the Delaware County Court of

Common Pleas ("trial court") pursuant to 42 Pa.C.S. § 9771(c)(1)(iii)(B)

following the revocation of his probation for a technical violation of the

conditions of his probation.[1]  On appeal, Clayborne raises several issues of

first impression concerning provisions of Act 44 of 2023[2] ("Act 44"), which,

---

[1]  Although 42 Pa.C.S. § 9771(c) does not define the term "technical violation," the General Assembly defined the term for purposes of section 9774.1(k), which relates to probation review conferences, as "[a] violation of the specific terms and conditions of a defendant's probation, other than by the commission of a new crime of which the defendant is convicted or found guilty by a judge or jury or to which the defendant pleads guilty or nolo contendere in a court of record."  42 Pa.C.S. § 9774.1(k).  As there is no debate whether Clayborne committed a technical violation of probation, for purposes of this Opinion it is sufficient to note that this definition of technical violation aligns with the sentencing scheme of section 9771(c), discussed below.

[2]  **See** Act of Dec. 14, 2023, P.L. 381, No. 44.

inter alia, substantially amended the Sentencing Code provisions governing resentences imposed following revocation of probation. Specifically, he contends that the trial court misinterpreted Act 44 and failed to account for its impact upon existing probation revocation procedure. To decide the issues he presents, we must determine whether the General Assembly intended the term "assaultive behavior" to include conduct that does not involve actual or threatened physical violence such that the trial court legally exercised its authority to resentence Clayborne to total confinement as a technical probation violator. *See* 42 Pa.C.S. § 9771(c). We must also decide whether the maximum sentence prescribed by the General Assembly in Act 44 for a first technical probation violation impacts a probationer's prerevocation rights to due process, a speedy hearing, and credit for time spent detained awaiting the revocation hearing and resentencing.

After careful review, we conclude that the trial court neither erred in imposing a sentence of total confinement nor in denying Clayborne's motion to dismiss the technical violation based upon the timing of his revocation hearing. It did, however, err in declining to award him credit for time served prior to revocation pursuant to 42 Pa.C.S. § 9760(1). Because Clayborne has already served the total confinement portion of his August 9, 2024 resentence, however, this issue appears to be moot. While we review this technically moot issue because it is capable of repetition and likely to evade review, we are

unable to afford him relief in this matter and are constrained to affirm his judgment of sentence in its entirety.

**Facts and Procedural History**

Clayborne's original probationary sentence stems from his possession with intent to deliver ("PWID") cocaine on October 8, 2019, an offense to which he pled guilty as an ungraded felony at docket number CP-23-CR-0001033-2020 ("the 2020 case").[3]  On September 21, 2020, in accordance with the terms of the plea agreement, he received a sentence of nine to twenty-three months of probation with restrictive conditions, followed by a two-year term of probation supervised by Delaware County Adult Probation and Parole Services ("Probation Services").

Several months before his probationary term expired, Clayborne submitted a drug screen to Probation Services that was positive for cocaine. N.T., 8/5/2024, at 15-18; N.T. 8/9/2024, at 42.  As this was not his first positive screen, his supervising probation officer Trevor Woodruff sought and obtained a bench warrant on May 2, 2024, to detain him pending a *Gagnon I* hearing.[4]  N.T., 8/5/2024, at 15-18; N.T. 8/9/2024, at 42; Bench Warrant Probation Violation, 5/2/2024, at 1.  The day before the *Gagnon I* hearing,

---

[3]  ***See*** 35 P.S. § 780-113(A)(30).  The crime to which Clayborne pled guilty was subject to a maximum sentence of ten years of incarceration.  ***See id.*** § 780-113(f)(1.1).

[4]  ***See Gagnon v. Scarpelli***, 411 U.S. 778 (1973), discussed further infra.

Clayborne submitted to an evaluation, which recommended that he receive treatment for his substance abuse and mental health disorders through "clinically managed, high-intensity residential services for co-occurring disorders." N.T., 8/9/2024, at 24-26.

At the hearing the following day, the trial court found that the Commonwealth established probable cause to believe that Clayborne had violated the terms and conditions of his probation in the 2020 case by using drugs and failing to complete court ordered treatment or other special conditions of his sentence. *Gagnon I* Hearing Results, 5/14/2024, at 1. The trial court rescinded the bench warrant upon the opening of a bed at an inpatient treatment facility and deferred the *Gagnon II* hearing for three months to permit Clayborne to complete inpatient treatment. *Id.*; Order, 5/14/2024, at 1; N.T., 8/9/2024, at 41-42.

Clayborne entered Conewago Snyder, a drug treatment and rehabilitation facility in Beavertown, Pennsylvania. The facility is equipped to manage the care of patients, like Clayborne, who have co-occurring disorders. *See* N.T., 8/9/2024, at 15, 26-34, 36. According to Conewago Snyder's director, Lisa Hershey ("Hershey"), Clayborne met with the facility's doctor upon entry, but he was otherwise "combative" during his entire stay and "there wasn't a whole lot of work that we could do with him." *Id.* at 29. Clayborne was reportedly "noncompliant with program rules and expectations," "would not comply with groups," made inappropriate

comments to staff members, refused to sit down or follow "basic rules," and was "very resistant … to any prompts whatsoever." *Id.* at 21-22, 29.

Clayborne's combative attitude culminated in an incident on May 23, 2024, six days after he entered treatment. Pamela Weaver, a program monitor, instructed Clayborne to stop playing video games and participate in a life skills group. *Id.* at 12. Clayborne refused. *Id.* Subsequently, he "approached" Weaver in a hallway while she was talking to another client and asked her if the life skills group was over. *Id.* at 12-13. When Weaver told him that the group had not yet ended, Clayborne "started screaming at [Weaver] that [she] just make[s] up rules" and "got in [her] face." *Id.* at 13-14. Clayborne "was only like six inches away" from her face when he was screaming at her. *Id.* at 14. Weaver called for help, and another staff member alerted Hershey and the assistant director of the facility. *Id.* at 14.

Before Hershey even exited her office to assist, Clayborne, "came up the hall" and approached Hershey and the assistant director "in a very aggressive, abrasive manner" in the doorway of Hershey's office. *Id.* at 19. Clayborne yelled that Conewago Snyder was "making up rules" and that he did not need to follow them. *Id.* at 23. Because Clayborne "would jump from one thing to another" with "a lot of curse words mixed in," Hershey "wasn't even sure [] what he was talking about." *Id.* Clayborne's aggressive manner made Hershey and the assistant director feel unsafe. *Id.* at 19. Specifically, Clayborne was "raising his voice," "yelling," and "moving towards [Hershey

and the assistant director] into the … doorframe to the doorway," obstructing the only exit from the office. *Id.* at 19. Several times, Hershey asked Clayborne "to back away from the door because he was coming towards us." *Id.* Hershey feared that Clayborne was going to escalate the situation by doing "something physical" as he was "push[ing] his way" into her office. *Id.* at 19-20.

Because Clayborne's "aggressive and intimidating" behavior posed a "high risk" to the safety of the staff and other patients, Hershey decided that Conewago Snyder could not continue to treat Clayborne. *See id.* at 20-21. Conewago Snyder unsuccessfully discharged Clayborne from the program and placed him on a "do-not-readmit list" based upon his "use of intimidating, aggressive, and abusive language" and his ongoing failure "to comply with program rules and expectations." *See id.* at 20-22. Although Conewago Snyder typically transported unsuccessfully discharged patients home, to a relative's house, or even to jail, they were "afraid" to do so for Clayborne and asked Probation Services for immediate assistance in removing him from the facility. *Id.* at 22; N.T., 8/5/2024, at 14.

Delaware County sheriffs were unavailable to transport Clayborne, so at Officer Woodruff's request, Luzerne County sheriffs took Clayborne into custody from Conewago Snyder on May 23, 2024. N.T., 8/5/2024, at 14, 20. Probation Services sought and obtained a bench warrant to detain Clayborne pending another *Gagnon I* hearing. Request for Bench Warrant, 5/23/2024,

at 1; Probation Violation Bench Warrant, 5/24/2024, at 1. Luzerne County sheriffs took Clayborne to jail in Snyder County, then Luzerne County, and arrived at the jail in Delaware County on May 30, 2024. N.T., 8/5/2024, at 19-21.

At Clayborne's *Gagnon I* hearing on June 13, 2024, the trial court determined that the Commonwealth had probable cause to establish that he committed technical violations of conditions imposed in the 2020 case. *See Gagnon I* Hearing Results, 6/13/2024, at 1. The court ordered Clayborne to be held in custody pending a *Gagnon II* hearing before the sentencing judge. *Id.* That same day, Officer Woodruff requested that the judge's chambers provide the first available date for the *Gagnon II* hearing, and chambers scheduled the hearing for August 5, 2024. N.T., 8/5/2024, at 22.

At the inception of the August 5, 2024 hearing, Clayborne moved to dismiss the probation violation, arguing that the Commonwealth failed to adhere to his right to a speedy hearing guaranteed by constitutional principles of due process and Pennsylvania Rule of Criminal Procedure 708. *Id.* at 3-5. He argued that his ongoing incarceration ran afoul of the presumption against incarcerating technical violators in Act 44, which had taken effect less than two months before. *Id.* at 4. Even if the Commonwealth established the need for his incarceration, Clayborne emphasized that he had been incarcerated without a *Gagnon II* hearing four to five times longer than the maximum sentence Act 44 authorized for a technical violation of probation. *Id.* at 4-5.

In response, the Commonwealth argued that the timeline for the hearing was standard. Even if not timely, it asserted that the failure to hold a speedy probation violation hearing should not result in dismissal of the violation because Clayborne could have requested to lift the detainer or to expedite the *Gagnon II* hearing. *Id.* at 10-11. Additionally, the Commonwealth maintained that holding the *Gagnon II* hearing two months after he was detained did not prejudice Clayborne. *Id.* at 11-12.

At the trial court's request, the Commonwealth reviewed the procedural history of the case and specified that the violation was premised upon the information provided by Hershey concerning Clayborne's behavior at Conewago Snyder. *See id.* at 13-23. Clayborne raised a hearsay objection because Hershey was not present to testify. *Id.* at 23-24. The trial court sua sponte continued the hearing to review Act 44 and to provide the Commonwealth with an opportunity to present firsthand witness testimony. *Id.* at 25. Clayborne's counsel indicated that he did not object as long as the Commonwealth agreed to Clayborne's immediate release. *Id.* Without explaining its rationale, the trial court declined to release Clayborne and continued the hearing until August 9, 2024. *Id.* In the meantime, Clayborne filed a memorandum of law in support of his motion to dismiss. *See generally* Letter Brief in Support of Motion to Dismiss VOP, 8/7/2024.

At the continued *Gagnon II* hearing, the Commonwealth established the aforementioned facts through the testimony of Weaver, Hershey, and

- 8 -

Officer Woodruff. At the conclusion of the hearing, the trial court determined that Clayborne had violated the conditions of his probation and that the Commonwealth had established, by a preponderance of the evidence, that his violation involved "assaultive behavior" within the meaning of section 9771(c)(1)(iii)(B).[5] N.T., 8/9/2024, at 43. Specifically, the trial court found him in violation of rule 9 of his probation requirements (requiring him to refrain from "overt behavior") based upon his "encounter" with Conewago Snyder staff, and rule 10(C) (requiring him to complete special conditions) based upon his failure to complete the court-ordered treatment. *See id.* at 40-43; *see also* N.T., 8/5/2024, at 8-9.[6] As a result, the trial court revoked

_____

[5] Originally, the trial court also found by clear and convincing evidence that Clayborne committed a technical violation that involved an identifiable threat to public safety pursuant to 42 Pa.C.S. § 9771(c)(1)(ii). After Clayborne argued that the Commonwealth did not present evidence establishing that there was no less restrictive means to incarceration, a requirement of subsection (c)(1)(ii), the trial court changed its mind. N.T., 8/7/2024, at 52-53.

[6] At both *Gagnon II* hearings, Officer Woodruff indicated that his reports erroneously listed the incident as violative of Rule 7 (requiring probationer to refrain from drug use), instead of the intended Rule 9. We suspect that his reference to "overt behavior" was shorthand for exhibiting threatening or overt behavior, but we cannot confirm because no written request for revocation filed with the clerk of courts appears in the certified record. *See* Pa.R.Crim.P. 708(A); *Commonwealth v. Quinlan*, 412 A.2d 494, 496 (Pa. 1980) ("[D]ue process requires a probationer receive written notice of the claimed probation violations prior to commencement of the revocation hearing[.]"). This particular procedural defect is not before us, as Clayborne did not object to it below or advance it as an issue on appeal. *See Commonwealth v. Collins*, 424 A.2d 1254, 1254 (Pa. 1981) (holding that probationer must preserve objection to inadequate notice before trial court);
*(Footnote Continued Next Page)*

Clayborne's probation in the 2020 case and sentenced him to one to thirty days in jail and a one-year term of probation. N.T., 8/9/2024, at 65-67, 69, 72; Sentencing Order, 8/9/2024, at 1. The court ordered Clayborne's immediate parole upon his completion of drug and psychiatric evaluations. ***See*** Sentencing Order, 8/9/2024, at 1.

The trial court declined to award credit to the resentence for the time Clayborne spent detained prior to the ***Gagnon II*** hearing, asserting that giving him credit for the seventy-nine days in custody on the detainer is "incompatible" with, and would "negate," newly added section 9771(c)(2)(iv), which authorized the trial court to incarcerate a probation violator for an additional thirty days beyond the statutory maximum sentences to obtain an evaluation if needed. N.T., 8/9/2024, at 68-69, 73-74. It also denied Clayborne's motion to dismiss the violation based upon due process and Rule 708 concerns, concluding that the two-step ***Gagnon*** process after a probation detainer takes longer than fourteen days as a practical matter, Probation Services followed "standard operating procedure," and Act 44 dealt with the "back end" of reducing probation violation sentences but not the "front end" of procedure concerning probation violation detainers. ***See id.*** at 57, 61, 70-73.

---

***see also Quinlan***, 412 A.2d at 497 (holding that probationer must allege that he was injured by a defect in written notice of allegations against him, not simply that record failed to reflect his receipt of such notice).

**Issues on Appeal**

Clayborne filed a timely notice of appeal. Both Clayborne and the trial court complied with Rule 1925 of our appellate procedural rules. He presents three issues for our review:

1. Whether … there was insufficient evidence to overcome the presumption against total confinement because [section 9771(c)(1)(iii)(B)] requires "assaultive behavior or included a credible threat to cause bodily injury to another" … [yet] the testimony only involved … cursing, approaching someone, complaining about made up rules, and refusing to go to group therapy[.]

2. Whether … the [trial] court erred in denying [Clayborne's] motion to dismiss under Pa.R.Crim.P. 708, the Due Process Clause, and the standard to dismiss articulated [**Commonwealth**] **v. Christmas**, 995 A.2d 1259 ([Pa. Super.] 2010), where [section 9771(c)(2)(i)] only allows [Clayborne] to be incarcerated for 14 days on a first technical violation …, and [Clayborne] was incarcerated 79 days before having the **Gagnon** [**II**] hearing[.]

3. Whether … the [trial] court erred in failing to award any time credit for the 79 days [Clayborne] spent detained solely on this violation petition, in contravention of the time credit statute, [42 Pa.C.S. § 9760(1).]

Clayborne's Brief at 5-6.

**Overview of Sentencing Code Provisions Pertaining to Probation
Revocation and Resentencing, as Amended by Act 44**

As each of Clayborne's issues require this Court to interpret the Sentencing Code as amended by Act 44, we begin with an overview of the relevant statutory provisions.[7]

A trial court decides the sentence to impose within the confines of the authority provided to it by the General Assembly. *See* 42 Pa.C.S. § 9703. Probation is a sentencing alternative that a court may impose in addition to, or instead of, confinement and other penalties. *See id.* §§ 9721(a)(1), (b), 9722.

The sentencing court has the authority to set the term of probation, select the authority responsible for supervising the probation,[8] and impose reasonable conditions of probation in accordance with section 9763. *Id.* § 9754(a), (b). Conditions must be individualized, necessary, and the least restrictive means available to promote the defendant's rehabilitation and protection of the public. *Id.* § 9763(b). There are thirteen specifically

_____

[7] The version of section 9771 applicable to Clayborne's resentencing was in effect from June 11, 2024 to October 19, 2025. We refer to this version unless otherwise specified. A new version of section 9771 with a minor change took effect on October 20, 2025. *See* Act of July 21, 2025, P.L. 127, No. 38, § 1 (changing subsection (C)(2)(iv)(B)'s reference to "problem-solving court" to "treatment court" consistent with amendments to section 916).

[8] Probation is supervised by county probation departments, *see* 42 Pa.C.S. §§ 9911-9914, or the state Department of Corrections, *see* 61 Pa.C.S. §§ 6171(11)(ii), 6172(a).

enumerated general conditions that a court may include, and one that authorizes the court to order the probationer to "do other things reasonably related to rehabilitation." *Id.* § 9763(b)(1)-(7), (9)-(15). A sentencing court also has authority to order certain specialized conditions of probation, such as the electronic home monitoring originally ordered in Clayborne's 2020 case. *Id.* § 9763(c), (d).

> Generally,
>
> [t]he court has inherent power to at any time terminate continued supervision, lessen the conditions upon which an order of probation has been imposed or increase the conditions under which an order of probation has been imposed upon a finding by clear and convincing evidence that a person presents an identifiable threat to public safety.

*Id.* § 9771(a). Further, upon proof by a preponderance of the evidence that a probationer violated "specified conditions of probation," the court may revoke an order of probation, increase the conditions of probation, or impose a brief sanction under an established court-imposed program. *Id.* § 9771(b); *see also id.* § 9771.1; *Commonwealth v. Foster*, 214 A.3d 1240, 1243 (Pa. 2019). Probation revocation is "an integral element of the original conditional sentence." *Commonwealth v. Mullins*, 918 A.2d 82, 85 (Pa. 2007).

Because a probation revocation results in a loss of liberty, a probationer must be accorded due process. *Gagnon*, 411 U.S. at 782; *Commonwealth v. Davis*, 336 A.2d 616, 620 (Pa. Super. 1975). Revocation occurs in a two-step process. First, when a probationer is detained based on an alleged probation violation, due process requires a *Gagnon I* prerevocation hearing

to determine whether probable cause exists to believe that the probationer committed a violation. *Commonwealth v. Ferguson*, 761 A.2d 613, 617 (Pa. Super. 2000). If the Commonwealth satisfies this burden, a second, more comprehensive *Gagnon II* revocation hearing follows at which trial court determines whether to revoke probation. *Id.*

After considering the "record of the sentencing proceeding, together with evidence of the conduct of the defendant while on probation," and making a finding on the record that a violation of probation occurred, the trial court may revoke the term of probation and resentence the probationer. *See* 42 Pa.C.S. §§ 9754(d), 9771(d). Subject to the limitations imposed by subsections (b.1) and (c), "the sentencing alternatives available to the court shall be the same as were available at the time of initial sentencing," including any applicable mandatory minimum sentence the Commonwealth may seek for the court to impose upon resentencing, with "due consideration being given to the time spent serving the order of probation." *Id.* § 9771(b). The trial court's discretion to resentence a probation violator to a period of total incarceration, however, is cabined by section 9771(c):

(c) **Limitation on sentence of total confinement**.--There is a presumption against total confinement for technical violations of probation. The following shall apply:

(1) The court may impose a sentence of total confinement upon revocation only if:

(i) the defendant has been convicted of another crime;

(ii) the court finds by clear and convincing evidence that the defendant committed a technical violation that involves an identifiable threat to public safety and the defendant cannot be safely diverted from total confinement through less restrictive means; or

(iii) the court finds by a preponderance of the evidence that the defendant committed a technical violation and any of the following apply:

(A) The technical violation was sexual in nature.

(B) The technical violation involved assaultive behavior or included a credible threat to cause bodily injury to another, including acts committed against a family or household member.

(C) The technical violation involved possession or control of a firearm or dangerous weapon.

(D) The technical violation involved the manufacture, sale, delivery or possession with the intent to manufacture, sell or deliver, a controlled substance or other drug regulated under … [t]he Controlled Substance, Drug, Device and Cosmetic Act.

(E) The defendant absconded and cannot be safely diverted from total confinement through less restrictive means.

(F) The technical violation involved an intentional and unexcused failure to adhere to recommended programming or conditions on three or more separate occasions and the defendant cannot be safely diverted from total confinement through less restrictive means. For purposes of this clause, multiple technical violations stemming from the same episode of events shall not constitute separate technical violations.

(2) If a court imposes a sentence of total confinement following a revocation, the basis of which is for one or more technical violations under paragraph (1)(ii) or (iii), the court shall consider the employment status of the defendant. The defendant shall be sentenced as follows:

- 15 -

(i) For a first technical violation, a maximum period of 14 days.

(ii) For a second technical violation, a maximum period of 30 days.

(iii) For a third or subsequent technical violation, the court may impose any sentencing alternatives available at the time of initial sentencing.

(iv) The time limitations contained in this paragraph shall not apply to the extent that a reasonable term of additional total confinement, not to exceed 30 days, is necessary to allow a defendant to either be evaluated for or to participate in:

(A) a court-ordered drug, alcohol or mental health treatment program; or

(B) a problem-solving court provided for in section 916 (relating to problem-solving courts).

(3) Nothing in this section shall prevent the adoption of a program [to establish swift, predictable and brief probation violation sanctions] under section 9771.1.

42 Pa.C.S. § 9771(c).[9]

### Issue 1: Overcoming the Presumption Against Incarceration for a Technical Violation Involving "Assaultive Behavior"

<u>Mootness</u>

We must first determine whether we can review this issue, as it appears

to be technically moot. ***See Commonwealth v. Gillins***, 302 A.3d 154, 162

(Pa. Super. 2023) (explaining that in general, case challenging sentence and

_____

[9] Subsection (b.1), regarding failure to pay fines, also limits the trial court's typical discretion in resentencing but is not applicable to this case.

- 16 -

not underlying conviction is moot upon expiration of sentence without demonstration of collateral consequences adequate to satisfy the case-or-controversy requirement) (citation omitted).  While the Commonwealth does not raise the issue of mootness, Clayborne acknowledges that he has already served the total confinement imposed, implicitly conceding that any relief we can afford him is now moot.  ***See*** Clayborne's Brief at 23 n.7.  He nonetheless contends that his appeal falls within an exception to the mootness doctrine because it is capable of repetition yet evading review.  ***Id.*** (citing ***Commonwealth v. Dixon***, 907 A.2d 468, 472 (Pa. 2006)).  "Pursuant to this principle, an appellate court may decide a case where issues important to the public interest are involved, the nature of the question under consideration is such that it will arise again, and review will be repeatedly thwarted if strict rules of mootness are applied."  ***Dixon***, 907 A.2d at 472-73.

We agree with Clayborne that this issue, as well as the other two issues he presents, satisfy this exception to mootness despite the apparent expiration of his sentence.  All three issues regarding the impact of Act 44 upon probation resentencing are issues of public importance that will arise repeatedly for others, and because of the short sentences permitted by Act 44 for first- and second-time technical violators of probation, consistently evade appellate review.  ***See Dixon***, 907 A.2d at 472-73; ***accord Commonwealth v. Phillips,*** 344 A.3d 360, 367 n.11 (Pa. 2025) (declining to dismiss appeal as moot despite suspected expiration of sentence during appeal because, inter

- 17 -

alia, deciding issue raised "will be useful and instructive to the bench and bar in future cases").

Scope and Standard of Review

Clayborne claims that the record insufficiently establishes that his technical violation constituted "assaultive behavior." He is therefore contending that the statutory prerequisites for a sentence of total confinement were not satisfied. This is a claim that the trial court exceeded its authority by imposing a sentence of total confinement, which constitutes a non-waivable legality of sentence challenge. *See Commonwealth v. Seals*, ___ A.3d ___, 2026 WL 739101, *11-12 (Pa. Super. 2026) (en banc).

As Clayborne's "challenge to the legality of this sentence requires us to engage in statutory interpretation," it "presents a question of law." *Commonwealth v. Prince*, 320 A.3d 698, 703 (Pa. Super. 2024) (citation and quotation marks omitted). Our standard of review for an issue of statutory interpretation is de novo and our scope of review is plenary. *Commonwealth v. Crosby*, 329 A.3d 1141, 1148-49 (Pa. 2025). To the extent that our textual analysis concludes that the trial court's authority is "preconditioned on the finding of a triggering fact," the "legality of sentence

claim includes our de novo review of whether the requisite fact exists." **Prince**, 320 A.3d at 706.

The Statutory Construction Act[10] guides our analysis. **See Commonwealth v. Gamby**, 283 A.3d 298, 306 (Pa. 2022). We begin by recognizing that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a).

The plain language of the statute traditionally "provides the best indication of legislative intent." **Crosby**, 329 A.3d at 1149 (Pa. 2025). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). The General Assembly has instructed courts to ascribe the "common and approved meaning" to its chosen words and phrases, unless the word or phrase is technical, has acquired a peculiar and appropriate meaning, or is expressly defined in the statute. 1 Pa.C.S. § 1903(a). Courts may consult dictionary definitions to illuminate the common and approved meaning of a word or phrase. **Commonwealth v. Chisebwe**, 310 A.3d 262, 269 (Pa. 2024); **Gamby**, 283 A.3d at 307 n.11. We consider the statutory language not in isolation, but in the context within which it appears. **Commonwealth v. Rosario**, 294 A.3d 338, 346 (Pa. 2023); **A.S. v. Pennsylvania State**

_____

[10] 1 Pa.C.S. §§ 1501-1991.

*Police*, 143 A.3d 896, 906 (Pa. 2016). "Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a).

If statutory language is ambiguous, sections 1921(c) and 1922 enumerate nonexclusive lists of eight statutory construction factors and five presumptions that we may consider to aid us in discerning the General Assembly's intent. *See id.* §§ 1921(c), 1922. "A statute is ambiguous when there are at least two reasonable interpretations of the text under review." *Commonwealth v. Green*, 291 A.3d 317, 327 (Pa. 2023).

The General Assembly's use of the same phrase in two different provisions does not automatically mean it intended the terms to have the same meaning. *Gamby*, 283 A.3d at 311 (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015) ("[I]n law as in life ... the same words, placed in different contexts, sometimes mean different things. … [I]dentical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute.")). If two statutes "relate to the same persons or things or to the same class of persons or things," however, they are "in pari materia" and we must construe them "together, if possible, as one statute." 1 Pa.C.S. § 1932(a)-(b).

If, at the end of the process of discerning legislative intent a "grievous ambiguity or uncertainty" in a penal statute remains, the rule of lenity requires that we must construe it strictly in favor of the defendant. *Commonwealth v. Rosario*, 294 A.3d 338, 350 (Pa. 2023); 1 Pa.C.S. § 1928(b)(1). The rule

of lenity does not require, however, that we give the words of a penal statute the narrowest possible meaning or disregard legislative intent. **Rosario**, 294 A.3d at 350.

<u>The Parties' and Trial Court's Interpretation of "Assaultive Behavior"</u>

Clayborne argues that his sentence of total confinement is "legally inappropriate" because the Commonwealth failed to establish, by a preponderance of the evidence, that he engaged in "assaultive behavior" in accordance with section 9771(c)(1)(iii)(B), as he neither committed nor threatened violent conduct. Clayborne's Brief at 26-27, 40. Clayborne argues, using the Black's Law Dictionary definition of "assault," that "assaultive behavior" requires that the person engage in "a battery, attempt, or a threat to commit physical injury." **Id.** at 26 (citing ASSAULT, Black's Law Dictionary (12th ed. 2024)). He contends that this interpretation of the phrase effectuates the General Assembly's intent to curtail rampant incarceration for minimal technical violations of probation. **Id.** Clayborne acknowledges that his actions—screaming, cursing, approaching people, and complaining—may have caused "fear or nervousness" in others, but he argues that this does not establish that the behavior was assaultive. **Id.** at 26-27.

Should this Court find the phrase "assaultive behavior" ambiguous, Clayborne contends that the considerations set forth in the Statutory Construction Act lead to the same conclusion. First, he points to the "almost identical language" of 61 Pa.C.S. § 6138(c)(1.3)(ii), which authorizes a trial

court to incarcerate an individual who commits a technical violation of parole conditions by engaging in "assaultive behavior." Clayborne's Brief at 28. Clayborne maintains that Section 9771 should be read in pari materia with section 6138, and that the General Assembly's use of "assaultive behavior" in section 9771(c)(1)(iii)(B) reflects its decision to mirror the use of the same phrase in section 6138. *Id.*

To support his assertion that assaultive behavior in the parole context requires "actual violence or a threat of violence," Clayborne cites two Commonwealth Court cases finding a parolee's behavior not to be "assaultive" because the parolee did not threaten physical harm or cause reasonable apprehension of bodily harm in another. *Id.* at 33-35 (citing *Jackson v. Bd. of Prob. & Parole*, 885 A.2d 598 (Pa. Cmwlth. 2005), and *Johnson v. Bd. of Prob. & Parole*, 706 A.2d 903, 904 (Pa. Cmwlth. 1998)).

He finds further support for his contention that "'assaultive behavior' must involve physical violence" in his reading of section 9771(C)(1)(iii)(B) in its entirety. *Id.* at 39 (emphasis added). He observes the General Assembly's use of the disjunctive "or" in section 9771(c)(1)(iii)(B), which permits the Commonwealth to overcome the presumption against incarceration by demonstrating that the probationer's technical violation included either "assaultive behavior" **or** a "credible threat to cause bodily injury to another." *Id.* at 39-40. In his view, any interpretation of "assaultive behavior" that includes nonviolent conduct such as "screaming, cursing, and [invading]

personal space" runs counter to the presumption that the General Assembly intends all words in a statute to be effective and certain, as there would be no need to include "credible threat to cause bodily injury" if such conduct was to be included. *Id.* at 40. He argues that the General Assembly "intended more than non-threatening words and acts, devoid of physical violence o[r] the threat of violence, when it chose the term 'assaultive behavior'." *Id.*

Clayborne additionally contends that because section 9771 is a penal statute, it must be strictly construed. He urges this Court to invoke the rule of lenity to resolve any ambiguity in the language to favor his interpretation. *Id.* at 35-36.

Clayborne further relies upon remarks from Senators Camera Bartolotta and Sharif Street from the floor during the passage of Act 44. *See id.* at 37-38 (reproducing remarks from Pa. S.J., 2023 Reg. Sess. No. 32). According to Clayborne, the floor statements reflect the General Assembly's intent to revise section 9771 to prevent a probationer's ensnarement in a "probation-to-prison revolving door" simply for non-criminal, non-violent, and minor technical violations. *Id.* at 37 (quoting Sen. Bartolotta's remarks, Pa. S.J., 2023 Reg. Sess. No. 32 (June 27, 2023)). He argues that his behavior was fueled by his "mental health withdrawal symptoms" and likens his behavior to childish complaints that constituted the sort of minor technical violation to which the senators referred. *Id.* at 38.

The Commonwealth endorses the trial court's analysis, which found that in the absence of a statutory definition of assaultive behavior, it properly gave the statutory language its common and approved usage in context, which is broader than an act constituting the crime of assault. Trial Court Opinion, 12/17/2024, at 7; *see also* Commonwealth's Brief at 19-20. Like Clayborne, the court borrows the definition of "assaultive behavior" used by the Commonwealth Court to construe section 6138, but reaches the opposite conclusion. Instead, the trial court found that in the context of both parole and probation violations, an assault is a "violent physical or verbal attack" and a "threat or attempt to inflict offensive physical contact or bodily harm on a person … that puts the person in immediate danger of or apprehension of such harm or contact." *Id.* at 5 (quoting *Flowers v. Bd. of Prob. & Parole*, 987 A.2d 1269, 1272 (Pa. Cmwlth. 2010)). In support of its conclusion that Clayborne engaged in "assaultive behavior," the trial court highlighted Conewago Snyder staff's credible testimony that: (1) Clayborne maintained a persistent combative attitude throughout his stay; (2) he got in Weaver's face with only six inches distance between them; (3) he used intimidating, aggressive, and abusive language during his encounter with Weaver and Hershey; and (4) Weaver and Hershey each perceived a need for external assistance with Clayborne. *Id.* at 6-7.

<u>Meaning of "Assaultive Behavior" in Section 9771(c)(1)(iii)(B)</u>

*Plain Language*

The question before us is what constitutes "assaultive behavior" to overcome the presumption against incarcerating a technical probation violator. Neither section 9771 nor the definitions section of the Sentencing Code defines "assaultive behavior." ***See generally*** 42 Pa.C.S. §§ 9702, 9771. We therefore begin by examining the common and approved usage of the phrase.

"Assaultive" is an adjective that modifies the noun "behavior." Words with a suffix "-ive" perform or tend toward an indicated action: in this case, assault.[11] The dictionary definition of "assaultive" includes two meanings: (1) "of, relating to, or tending toward assault," as in "assaultive behavior" and (2) "having an intense or abrasive effect on the senses or emotions," such as "loud and assaultive music."[12]

The dictionary defines "assault" as (1) "a violent physical or verbal attack"; (2) "a military attack usually involving direct combat with enemy forces"; and (3) "a concerted effort (as to reach a goal or defeat an adversary)," such as "an assault on drug trafficking."[13] Referring to "law," the definition also includes (1) "a threat or attempt to inflict offensive physical contact or bodily harm on a person (as by lifting a fist in a threatening manner)

---

[11] "-ive." Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/-ive (last accessed on 2/17/2026).

[12] "Assaultive." Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/assaultive (last accessed on 2/17/2026).

[13] "Assault." Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/assault (last accessed on 2/17/2026).

that puts the person in immediate danger of or in apprehension … of such harm or contact" and (2) rape. *Id.* Thus, an assault can involve actual, attempted, or threatened physical violence, but it also includes a violent verbal attack or a threat or attempt to inflict offensive physical contact.

The definition of assault in Black's Law Dictionary, Clayborne's dictionary of choice, is consistent. First, as it relates to "criminal & tort law," it defines an assault as a "threat or use of force on another," placing a person in "reasonable apprehension of imminent harmful or offensive contact," and "the act of putting another person in reasonable fear or apprehension of an immediate battery by means of an act amounting to an attempt or threat to commit a battery." ASSAULT, Black's Law Dictionary (12th ed. 2024). Under "criminal law," it includes an attempt to commit battery with specific intent to cause physical injury or actually causing physical injury to another person intentionally, knowingly, recklessly, or with criminal negligence. *Id.* It also defines assault in the "popular[]" sense as "any attack." *Id.*

The definitions—including the Black's Law Dictionary definition cited by Clayborne—recognize that an "attack," not limited to physical conduct, may fall under the plain meaning of "assault." Taken together, these dictionary definitions reflect that the word "assaultive" includes behavior tending towards actual, attempted, or threatened infliction of bodily harm, as well as behavior tending towards a violent verbal attack or behavior tending towards attempted or threatened offensive physical contact. The key components are a violent

verbal or physical attack—i.e., one made aggressively and with intensity and abrasiveness—that reasonably causes another fear of imminent bodily injury or offensive physical contact. Thus, we cannot agree with Clayborne that either a specific threat of physical violence or the commission/attempt of an act of physical violence is essential to the term under a plain language interpretation. Rather, to be "assaultive," behavior may be physically violent or expressly threaten violence, but may also be another kind of "attack," including one that is solely verbal and rises to a level of aggressiveness and force such that it tends towards assault and places a person in reasonable fear of imminent bodily injury or offensive physical contact.

*Ambiguity*

Unfortunately, our analysis cannot end here, as the conduct in subsection (c)(i)(iii)(B) is not limited to "assaultive behavior," but could alternatively include "a credible threat to cause bodily injury to another." 42 Pa.C.S. § 9771(c)(1)(iii)(B). This raises the question of what constitutes "assaultive behavior" in light of the proffered specific alternative. Viewing the full text of the subsection as a whole, there are two potential interpretations: (1) the General Assembly intended "assaultive behavior" to be limited to actual physical violence in contrast to a credible threat of bodily injury or (2) the General Assembly intended to use the term "assaultive behavior" in its broader common-sense meaning (as found hereinabove) differentiated from a credible threat of bodily injury in another respect. Given the phrase has

more than one reasonable interpretation, we turn to tools of statutory interpretation to assist us in resolving the ambiguity.

### *1 Pa.C.S. § 1921(c)*

The General Assembly amended section 9771(c) in Act 44 of 2023, a bipartisan effort that amended Sentencing Code provisions related to probation. We find it most helpful to begin by evaluating the new enactments alongside the prior version of the affected statutory provisions, considering, in particular, the scope and breadth of the amendments included in Act 44 and statements made by those involved in the drafting of the legislation. These details shed light on a number of the factors we may consider when untangling ambiguous language in a statute. *See* 1 Pa.C.S. § 1921(c)(1)-(5), (7) (the occasion and necessity for the statute, the circumstances behind its enactment, the mischief to be remedied, the object to be obtained, former versions of a statute, and contemporaneous legislative history).

It is readily apparent from the text of Act 44 as a whole, when juxtaposed with the prior version of the Sentencing Code, that the General Assembly intended to change significantly the state of probation in this Commonwealth. A simple comparison of Act 44 to the prior statute demonstrates the General Assembly's intent to constrict a judge's authority to exercise discretion when imposing terms and conditions of probation in the first instance and when considering whether to modify or revoke probation along the way.

Previously, the court could impose reasonable conditions "it deem[ed] necessary," in its discretion, "to ensure or assist the defendant in leading a law-abiding life." *See* 42 Pa.C.S. §§ 9754(b), 9763(c) (versions effective prior to December 10, 2024). Now, the court solely may impose conditions that are individualized, necessary, and the least restrictive to promote the defendant's rehabilitation and to protect the public. *See* 42 Pa.C.S. §§ 9754(b), 9763(c).

Act 44 also implemented a new statutory provision creating a requirement for "probation review conference[s]." *See* 42 Pa.C.S. § 9774.1. It includes a detailed description of how, when, and under what circumstances such conferences must be conducted, and provides the potential for early termination of probation. *See id.* § 9774.1(a)-(i).

Section 9771 dictates the conditions under which the trial court may revoke a term of probation. Prior to Act 44, section 9771(c) specified that the court "shall not impose a sentence of total confinement" unless the court found that the defendant was convicted of another crime, his conduct indicated he would likely commit another crime unless confined, or total confinement was "essential to vindicate the authority of the court." 42 Pa.C.S. § 9771(c) (effective December 18, 2019, to June 10, 2024). Post-amendment, section 9771(c) prohibits the court from imposing a sentence of total confinement for a technical violation of probation, subject to specifically delineated exceptions. *See* 42 Pa.C.S. § 9771(c); *see also supra*, pp.15-16. As we discuss in more

detail below, Act 44 places specific, relatively short maximum sentences for a period of confinement imposed for a first or second technical violation. *See id.*

The stated goal of several of Act 44's bipartisan co-sponsors was to "reform Pennsylvania's probation system" in an attempt to "implement greater fairness in the process, eliminate excessive incarceration, give individuals a more reliable second chance to get their lives right, and offer taxpayers a break from ever-rising state correctional costs." *See* Co-Sponsorship Memorandum introducing S.B. 838 by Senators Lisa Baker, Camera Bartolotta, and Anthony Williams (Dec. 15, 2022). The co-sponsors emphasized that they designed Act 44 to put "parameters in place" to disrupt the "probation-to-prison revolving door" for "technical violations, such as a minor traffic offense," that "can perpetually extend the clock on an offender's term and result in re-confinement." *See id.*

While these comments do not necessarily speak to the intent of the General Assembly as a whole in passing the Act, they clearly support our interpretation of the General Assembly's intent to reform Pennsylvania's system of probation—and, in particular, incarceration for technical violations of probation—from reading the Act as a whole. This is also in accord with the public commentary provided by Governor Shapiro when he signed the bill into law in the presence of former probationer Meek Mill, whose probationary term

was extended multiple times following technical violations. *See* Pa. Gov. Mess., *Comprehensive Probation Reform Legislation* (Dec. 15, 2023).

### *Parole statute*

With an understanding of the scope of the changes made by the Act, we turn to the statutory provisions governing technical violations of parole to see if those provisions shed light upon our understanding of "assaultive behavior" as an alternative to a credible threat to injure another. Clayborne directs our attention to section 6138(c)(1.3)(ii), amended in 2019 to allow incarceration for technical violations of parole that "involved assaultive behavior or included a credible threat to cause bodily injury to another." 61 Pa.C.S. § 6138(c)(1.3)(ii). Because this language is identical to section 9771(c)(1)(iii)(B), Clayborne argues that we should read both sections in pari materia.

Clayborne does not analyze whether 9771 and 6138 relate to "the same persons or things or to the same class of persons or things," which is required to construe them "together, if possible, as one statute." 1 Pa.C.S. § 1932(a)-(b). Both probation and parole involve supervision outside the confines of incarceration to ensure compliance with certain terms and conditions, the authority to set the rules, supervise the offenders' compliance, and "violate" the offender is statute dependent, and involves the separation of powers between the legislative, judicial, and executive branches. *See Commonwealth ex rel. Banks v. Cain*, 28 A.2d 897, 900-01 (Pa. 1942)

(delineating the separate powers of each branch of government has over sentencing and parole). Probation and parole are distinct, however, and not interchangeable. *See Commonwealth v. Koger*, 295 A.3d 699, 709 (Pa. 2023) (cautioning this Court to avoid using legal standards interchangeably when reviewing issues related to violations of probation and parole); *Commonwealth v. Holmes*, 933 A.2d 57, 59 n.5 (Pa. 2007) (explaining that the "difference between these often confused terms" stems from different sources of statutory authority); *Commonwealth v. Simmons*, 262 A.3d 512, 531 (Pa. Super. 2021) (en banc) (Kunselman, J., concurring) (explaining that the "legislature treats parole and probation separately" even though practitioners and trial court judges colloquially refer to "VOP hearings" without distinction).

Section 6138 applies to parolees under the jurisdiction of the Pennsylvania Parole Board.[14] Unlike probation, parole is not one of the enumerated sentencing alternatives ordered by a court at the time of sentencing or resentencing. *See* 42 Pa.C.S. § 9721(a). After serving part of a sentence of incarceration, a convicted criminal offender is conditionally released from confinement to serve the remainder of the term outside the

---

[14] The Parole Board, an independent administrative board of nine members appointed by the Governor with the advice and consent of a majority of the Senate, has exclusive power over parole and violation decisions concerning persons sentenced by a court to imprisonment in a State correctional institution or to special parole. 61 Pa.C.S. §§ 6111, 6132.

confines of the institution in compliance with parole conditions. *Holmes*, 933 A.2d 57, 59 n.5. Parole "is an amelioration of punishment," but "it is in legal effect imprisonment." *Cain*, 28 A.2d at 901 (citation, quotation marks, and italics omitted). "Unlike a probation revocation, a parole revocation does not involve the imposition of a new sentence." *Commonwealth v. Kalichak*, 943 A.2d 285, 290 (Pa. Super. 2008). Instead, the statutory sanction for a parole revocation is recommitment for the remainder of the original sentence previously imposed. *See* 42 Pa.C.S. § 9776(e); 61 Pa.C.S. §§ 6137(h), 6138(a).

Furthermore, unlike probation, the Parole Board has the discretion to "revoke" the parole of a "convicted violator" only. *See* 61 Pa.C.S. § 6138(a), (c). Instead of revoking the parole of a "technical violator," the Parole Board is authorized to detain a technical parole violator pending a hearing and to recommit the offender to a community corrections center or facility for six months, whereupon the technical violator is automatically reparoled. *Id.* § 6138(c)(1.3). If the Parole Board determines that certain conditions are present, however, it may instead recommit the offender to a state correctional institution or contracted county jail for defined maximum terms of six months, nine months, and one year for first, second, and third technical parole violations, respectively, with automatic reparole at the end of the specified term. *Id.* § 6138(d)(3)-(5).

While the distinctions between probation and parole prevent us from reading these statutes in pari materia, we agree that it is significant that both statutes address the permissibility of a sentence of incarceration for technical violations involving either "assaultive behavior" or a credible threat to cause bodily injury to another.[15]  We therefore turn to court interpretations of the General Assembly's use of assaultive behavior in the context of parole to see what, if anything, it reveals about its use in the probation context, with due regard to the different nature of probation and parole.

*Flowers*, the case cited by the trial court, was decided in 2011.  Like most of the Commonwealth Court cases interpreting the phrase "assaultive behavior," *Flowers* interpreted the term as it is used in a regulation promulgated by the Parole Board requiring offenders on parole to "refrain from an assaultive behavior" as a general condition of parole, sometimes referred to as condition 5(c).  *See Flowers*, 987 A.2d at 1272; 37 Pa.Code § 63.4(5)(iii).  Significantly, the code provision does not include the alternative "credible threat" language contained in sections 6138(c)(1.3)(ii) and 9771(c)(1)(iii)(B).  Thus, cases construing condition 5(c) shed little light on the particular ambiguity at issue.  They do, however, reconfirm our analysis of the plain meaning of "assaultive behavior," standing alone, as "encompass[ing] a broader category of actions than would the crime of

_____

[15]  In fact, all bases for committing a technical parole violator to prison under section 6138(c)(1.3) are identical to those in section 9771(c)(1).

assault[.]" **Flowers**, 987 A.2d at 1272 (citation omitted). As stated above, the **Flowers** court relied upon the dictionary definition of "assault" in determining what constitutes "assaultive behavior," recognizing that it included, in relevant part, both physical and verbal attacks. **Id.** (citation omitted).[16]

Notably, Clayborne does not cite, nor did our research uncover, any cases interpreting 61 Pa.C.S. § 6138(c)(1.3)(ii) after the General Assembly amended it in 2019 to add "or included a credible threat to cause bodily injury to another" as an alternative to a parole violation that "involved assaultive behavior." **See** Act of Dec. 18, 2019, P.L. 776, No. 115, § 20(c)(1.3)(ii).

---

[16] In neither **Jackson** nor **Johnson**—the two cases cited by Clayborne—does the Commonwealth Court state that assaultive behavior **must** include physical violence. Nor do **Jackson** and **Johnson** preclude a finding that a violent verbal attack constitutes assaultive behavior. In fact, **Johnson** included a violent verbal attack within the definition of "assaultive behavior," which **Jackson** then repeats. **Johnson**, 706 A.2d at 905; **Jackson**, 885 A.2d at 602. Both cases involved brief in-person interactions with another without physical harm, an overt verbal threat of physical harm, or anything that could be construed as a verbal attack. The key in both cases was a determination that the parolee's behavior did not objectively evoke a reasonable apprehension of bodily harm. **See Jackson**, 885 A.2d at 601-02 (majority holding that inmate's unsolicited hug of prison employee before his release on parole was offensive and unwelcome to employee but was not assaultive behavior because it lacked a threat or an offer with force to do harm that would "evoke a reasonable apprehension of bodily harm in any individual"); **Johnson**, 706 A.2d at 904-05 (holding that parolee's tap on shoulder of witness about to testify against his cousin's boyfriend at preliminary hearing while saying "[y]ou ain't got to go out on a brother ... [, d]on't go out on a brother" was not assaultive behavior; parolee may have intimidated witness but he did not threaten physical harm and statement was not "one that would evoke a reasonable apprehension of bodily harm in any individual").

Without cases analyzing the amended version of section 6138(c)(1.3)(ii), the parole cases do not help our ambiguity analysis. As such, we turn back to the language of section 9771(c) with its two alternatives.

*Analysis*

We agree with Clayborne that the legislative history of Act 44 shows the General Assembly intended to restrict incarceration for technical violations of probation as compared to the prior version of the statute. We disagree, however, that this intent supports his narrow interpretation of the phrase "assaultive behavior." Clayborne's construction of the statute requiring actual physical violence overlaps substantially with crimes prohibiting "assault" as stated in the Crimes Code.[17] Significantly, however, the General Assembly did not include any assault crimes, which are clearly defined by statute, in section 9771(c)(1)(iii)(B). Had the General Assembly intended "assaultive behavior" to include criminal behavior only, it would not have been necessary to specify

_____

[17] In fact, even in the criminal context, an assault does not always require conduct that involves an act or specific threat of physical violence. To the contrary, the crime of "simple assault" includes "attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa.C.S. § 2701(a)(3).

that the trial court has authority to incarcerate a probationer for "assaultive behavior."[18]

> Our directive in this respect is clear:
>
> [I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include. Consequently, as a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says; one must also listen attentively to what it does not say.

***Commonwealth v. Johnson***, 26 A.3d 1078, 1090 (Pa. 2011) (cleaned up; citation omitted). The broader read of "assaultive behavior" as encompassing more than acts or specific threats of physical violence conveys a threshold of behavior that is more dangerous than mere disrespect, rudeness, or brief or isolated misbehavior, any of which reasonably could have triggered the trial court's authority to impose a sentence of total confinement to "vindicate the authority of the court" under the prior version of section 9771(c). Interpreting "assaultive behavior" as broader than "assault" cabins a trial court's discretion but gives deference to the language selected by the General Assembly, which ostensibly recognized the need to protect individuals and the public at large from a probationer's conduct—whether physical or verbal—that causes, threatens, or places another in reasonable fear of imminent bodily injury or offensive physical contact.

---

[18] Further, Act 44 retained the concept of noncriminal technical violations, including allowing a technical violator to be sentenced to incarceration for conduct that in and of itself is not a crime. ***See, e.g.,*** 42 Pa.C.S. § 9771(c)(1)(ii), (iii)(A), (B), (C), (E), (F).

We further disagree with Clayborne that this interpretation of "assaultive behavior" renders the alternative language contained in the statute "ineffective and meaningless." *See* Clayborne's Brief at 39. As stated above, "assaultive behavior" instills in another person a reasonable fear of imminent bodily injury or offensive physical conduct. A credible threat to cause physical injury may include, for example, verbal threats or statements made at a distance, such as the threats in *Commonwealth v. Simmons*, which relied upon the act of expressing the threat, not its actual effect upon the intended victim. *See Commonwealth v. Simmons*, 56 A.3d 1280, 1284–85 (Pa. Super. 2012) (interpreting "assaultive behavior" as used in conditions of special probation set forth in 37 Pa.Code § 65.4(5)(iii) as not requiring direct communication of threats to victim; Simmons' repeated communication to third parties that he was going to cut up victim and feed him to pigs alongside promise that Simmons was going to make it worth his while if he had to return to death row constituted assaultive behavior), *aff'd per curiam*, 91 A.3d 102 (Pa. 2014)).[19] It may be devoid of any physical action or immediate attempt

_____

[19] We recognize that the **Simmons** Court classified this conduct as assaultive behavior. We note, however, that the **Simmons** Court was discussing a condition of special probation (37 Pa. Code § 65.4(5)(iii)), not the Sentencing Code, and it did not conduct an interpretation of the meaning of "assaultive behavior" in reaching its decision. Instead, it relied wholesale upon the Commonwealth Court's interpretation of the term in **Malarik v. Bd. of Prob. & Parole**, 25 A.3d 468, 470 (Pa. Cmwlth. 2011), which, in turn, interpreted the same phrase applicable to parolees in 37 Pa. Code § 63.4(5)(iii). Neither code provision includes the companion "credible threat" language that appears
*(Footnote Continued Next Page)*

- 38 -

to act yet still be credible enough for a court to conclude that total confinement is warranted. **Cf. id.** at 1288 (Wecht, J., dissenting) (expressing concern with the majority's expansive interpretation of "assaultive behavior" because the General Assembly could not have intended a probationer to violate probation and go to state prison by stating that he was going to kill a referee while watching a football game and upset with a call).

Along these lines, it is telling that the General Assembly did not require a credible threat to be made directly to a victim; it is sufficient that a threat of bodily injury that the court deems credible is made by the probationer. Conversely, including a "verbal attack" that places another in fear of harm by the probationer in the definition of "assaultive behavior" conveys intensity, proximity, and immediacy vis a vis another person and that person's reasonable fear of imminent harm. Given that the goal of probation is to protect the community and rehabilitate the offender, it is reasonable to conclude that the General Assembly wanted to curb violent and aggressive verbal outbursts directed at another person even if the probationer does not cause or threaten to cause bodily injury.

We therefore conclude that in the context of section 9771(c)(1)(iii)(B), the General Assembly intended "assaultive behavior" to mean (1)(a) a violent physical attack, (b) violent verbal attack, or (c) the threat or attempt to inflict

---

in section 9771(c)(1)(iii)(B). Thus, **Simmons** is not controlling in that respect.

offensive physical contact or bodily harm, (2) directed to a person, (3) which places the person in danger, or in reasonable apprehension, of imminent bodily injury or offensive physical contact. This not only comports with the dictionary definition of the word "assaultive" and the Commonwealth Court's interpretation of the same phrase, but also aligns with the occasion and necessity of Act 44, the mischief the General Assembly sought to remedy, and the object to be obtained, based upon our consideration of the circumstances of the enactment of Act 44, the prior version of section 9771(c), and the contemporaneous legislative history, rendering all portions of the subsection effective and certain. *See* 1 Pa.C.S. §§ 1921(c), 1922(2).

### Application

We find no error in the trial court's conclusion that Clayborne's actions constituted "assaultive behavior." Clayborne's characterization of his behavior as petulant, complaining, swearing, and an invasion of personal space deemphasizes the loud, aggressive, and intimidating nature of his outburst. He was not simply awkwardly standing too close to someone while speaking loudly or passively cursing and complaining from a distance or from a seated posture. He approached and interrupted Weaver while she was with a client and physically positioned his body six inches from her face. He pursued Hershey while she was exiting her office and physically stood in the doorway, blocking her only means of egress, screaming and swearing at her and the facility's assistant director. His persistent shouting, agitation, and body

- 40 -

language reasonably caused Weaver and Hershey to fear he would harm them. This was not just a de minimus rule infraction; this was a verbal attack that placed Hershey and Weaver in reasonable fear of imminent bodily injury.

Clayborne's technical violation of probation involved assaultive behavior. The trial court thus permissibly resentenced him to a period of total confinement.

### Issue 2: Speediness of Revocation Hearing

<u>Arguments of the Parties and Trial Court</u>

In his second issue before this Court, Clayborne argues that the delay in conducting his *Gagnon II* hearing violated his due process right to liberty and his right to a speedy hearing under Rule 708. Clayborne's Brief at 40-57. His argument is two-fold. First, he briefly discusses the general standards for due process[20] and contends that the failure to hold the hearing until he had served multiple terms of the maximum sentence for a first technical violation of probation violated his right to be heard at a hearing held at a "meaningful time." *Id.* at 42-43. Second, he contends that the requirement of a speedy violation of probation hearing contained in Rule 708 of the Pennsylvania Rules of Criminal Procedure must be viewed in light of Act 44. *Id.* at 44. Because Act 44 severely curtailed maximum incarceration terms for first and second

---

[20] Clayborne raises his due process claim solely under the United States Constitution; he does not raise an argument under the Pennsylvania Constitution. *See* Clayborne's Brief at 41 (referencing only the Due Process Clause of the Fourteenth Amendment of the United States Constitution).

technical violations, he argues that it effectively hastened the timeframe in which prejudice by a prehearing detention is measured pursuant to the factors set forth in **Commonwealth v. Christmas**.  **Id.** at 44.  He emphasizes that he was incarcerated for seventy-nine days prior to his **Gagnon II** revocation hearing yet the ultimate sentence for a first technical violation is at most fourteen or forty-four days of incarceration (and only if the Commonwealth overcomes a presumption against incarceration).  **Id.** at 47.  While a probation officer is vested with discretionary power to arrest a probation violator, **see** 42 Pa.C.S. § 9913, Clayborne argues that no law or rule requires a prerevocation detention.  Clayborne's Brief at 48.

He further asserts that the Commonwealth failed to explain why it took seventy-nine days to complete a **Gagnon II** hearing and that it failed to act with diligence in scheduling the hearing.  **See id.** at 49.  Even if the availability of the trial judge was an issue—something that Clayborne claims was not established—he argues that, like Rule 600,[21] the Commonwealth has a duty to exercise reasonable diligence to ensure that the revocation hearing happens in a timely fashion by requesting that another judge conduct the hearing.  **Id.** at 49-53.

Lastly, he claims that he was prejudiced by the delay.  **Id.** at 47-48.  Clayborne does not allege that the seventy-nine days impacted the

---

[21] **See** Pa.R.Crim.P. 600.

presentation of witnesses or evidence in his case. Instead, he argues that his personal liberty was unnecessarily restrained. *Id.* He points to his release on parole after one day, demonstrating that he served seventy-nine times longer than he needed to. *Id.* He emphasizes that he was not incarcerated for any reason other than the probation detainer, which makes the prejudice particularly acute because he was unnecessarily incarcerated. *Id.* at 54, 57.

The trial court explains that Clayborne's assaultive behavior at Conewago Snyder presented safety concerns for the staff and other patients, thereby necessitating his immediate removal. Trial Court Opinion, 12/17/2024, at 8-9. Because he was in Snyder County and the Delaware County sheriff's department was unavailable to pick him up, it took seven days to transport him to Delaware County. *Id.* at 9. After that, the trial court maintains that the two-step *Gagnon* process proceeded in a standard and timely fashion, with Officer Woodruff promptly requesting hearing dates and the court scheduling the hearings in accordance with the earliest available date on its schedule. *Id.* at 9-10. Without expounding upon its analysis, the trial court concluded that Clayborne "has not demonstrated prejudice by the delay." *Id.* at 10.

The Commonwealth echoes the trial court's analysis that the timeframe was standard, especially for a detainee located in another county, and notes that this Court has found that even a "five-month delay is not in and of itself unreasonable." Commonwealth's Brief at 14 (citing ***Commonwealth v.***

*Saunders*, 575 A.2d 936, 938 (Pa. Super. 1990)). As for the Commonwealth's due diligence, it asserts that Clayborne "cites to no authority to support that the Commonwealth should have, or was required to, request an 'expedited date' even sooner that the court's calendar would allow." *Id.* at 15. Finally, the Commonwealth argues that Clayborne did not experience prejudice in the form of evidentiary issues, and, as for his continued incarceration, he never filed a motion to lift the detainer after he was arrested on the bench warrant. *Id.* at 16.

Analysis

The timeliness of a revocation hearing is governed by Rule 708 of our Rules of Criminal Procedure. It provides, in relevant part, that a court may not revoke probation unless there has been "a hearing held as speedily as a possible at which defendant is present and represented by counsel" and "a finding of record that the defendant violated a condition of probation." Pa.R.Crim.P. 708(B)(1)-(2).

This Court has interpreted the language "as speedily as possible" as requiring a hearing within a reasonable time. *Christmas*, 995 A.2d at 1262. Rule 708 does not contain a presumptive period in which a hearing must be held; "instead, the question is whether the delay was reasonable under the circumstances of the specific case and whether the appellant was prejudiced by the delay." *Id.* "In evaluating the reasonableness of a delay, the court examines three factors: the length of the delay; the reasons for the delay;

and the prejudice resulting to the defendant from the delay." *Id.* at 1263.

The speediness of a hearing "is not measured solely on length of the delay,"

as the "court must analyze the circumstances surrounding the delay to

determine if the Commonwealth acted with diligence in scheduling the

revocation hearing." *Commonwealth v. Clark*, 847 A.2d 122, 124 (Pa.

Super. 2004).

When evaluating prejudice, courts must bear in mind that probation is

a "discretionary penological measure to which a defendant has no absolute

right," with its primary goal the rehabilitation and restoration of the individual

to a "useful life." *Commonwealth v. Marchesano*, 544 A.2d 1333, 1336

(Pa. 1988). The probationer must establish actual prejudice, which in the

probation context is "something which would detract from the probative value

and reliability of the facts considered, vitiating the reliability of the outcome

itself." *Id.* A prompt revocation hearing serves the purpose of (1) avoiding

"such prejudice by preventing the loss of essential witnesses or evidence, the

absence of which would contribute adversely to the determination" and (2)

preventing "unnecessary restraint of personal liberty." *Id.*

The length of time at issue in this case is the seventy-nine days between

the day Clayborne was picked up on the bench warrant and the *Gagnon II*

hearing on August 9, 2024. As for the reason for the delay, even if one

quibbled about the weeklong process to transport Clayborne across several

counties, the Commonwealth's diligence in overcoming the trial court's

schedule, or the Commonwealth's failure to bring the necessary witnesses to the first *Gagnon II* hearing, the underlying crux of Clayborne's argument is that the standard operating procedure for scheduling probation revocation hearings is incongruent with Act 44. *See* Clayborne's Brief at 49 (agreeing with the trial court that the "detention procedure and delay" in this case "is customary in Delaware County"). As defense counsel put it at the hearing, Act 44 was supposed to be "a sea change about how we do probation revocations," yet counsel did not see "a lot of seas changing even though it's supposed to." N.T., 8/9/2024, at 57. Clayborne already exceeded the maximum statutory term even before the court held a hearing to determine whether the Commonwealth had probable cause to detain him and to hear the allegations against him. *Id.* at 61. His pretrial detention time, as compared with the ultimate maximum sentence, is both the reason Clayborne considers the seventy-nine days to be an unreasonable "delay" and the basis of his argument that he was prejudiced in the form of unnecessary restraint of liberty.[22]

_____

[22] The law is clear that "[i]f a defendant is already incarcerated on the charges that triggered the probation revocation, he cannot claim the delay in holding his revocation hearing caused him any loss of personal liberty." *Christmas*, 995 A.2d at 1263; *see also Marchesano*, 544 A.2d at 1336 (holding defendant did not establish prejudice; he failed to show he was "subject to incarceration as a result of any delay in the revocation of probation hearing"); *Clark*, 847 A.2d at 124 (holding that probationer did not establish "prejudice because of the delay as he was not imprisoned longer than he otherwise would have been"). What remains unclear is what constitutes an "unnecessary
*(Footnote Continued Next Page)*

Prior to the passage of Act 44, the trial court could resentence a technical violator up to the maximum sentence for the original crime within the fairly broad confines of section 9771. Section 9771(c) now generally presumes that a probationer cannot be sentenced to total confinement for a technical violation, and even if the technical violation warrants incarceration, a trial court may only sentence a first-time technical violator to serve no more than fourteen days of incarceration—and no more than thirty additional days if an evaluation is required. Therefore, there is some commonsense appeal to Clayborne's argument that the concept of what constituted a speedy probation revocation hearing under the prior law can no longer be the standard.

As the trial court observed, however, Act 44's amendments pertain solely to the "back end" of reducing probation violation sentences, not the "front end" of procedure concerning probation violation detainers. N.T., 8/9/2024, at 57, 61, 70-73. Act 44 is silent concerning prehearing detention. As Clayborne concedes, apart from his argument concerning the length of his prehearing detention in light of Act 44, the hearing in this matter was not inordinately drawn out or delayed. Thus, if we were to rule that Clayborne

_____

restraint of personal liberty" when a probationer is incarcerated solely on a detainer awaiting a determination of whether he violated the technical terms of his probation, such that the reliability of the outcome is vitiated. None of the cases cited by Clayborne involve a determination that a probationer experienced actual prejudice by an unnecessary restraint of liberty, and our research located only circumstances that do not constitute such prejudice, such as **Marchesano**, **Christmas**, and **Clark**.

was denied a speedy hearing because his prerevocation incarceration exceeded his post-revocation penalty, it would be tantamount to concluding that prehearing detention of technical violators inherently violates Rule 708 until larger systemic changes to expedite the procedure are made.[23]

It is possible the General Assembly envisioned limiting or eliminating prehearing detention for technical violations as part of its effort to prevent the revolving door of incarcerating probationers for minor infractions.[24]  But that

_____

[23] We observe that prior to the passage of Act 44, our Supreme Court's Criminal Procedural Rules Committee published proposed rules for comment addressing "statewide procedural rules governing bail proceedings and technical violations of county probation and parole."  Proposed Amendment of Pa.R.Crim.P. 122; Rescission of Pa.R.Crim.P. 520-529 and Replacement with Pa.R.Crim.P. 520.1-520.19; Adoption of Pa.R.Crim.P. 708.1, and Renumbering and Amendment of Pa.R.Crim.P. 708, 52 Pa. B. 205, 2022 PA REG TEXT 603827, 1/8/2022.  Of relevance here, the Committee proposed adding new Rule 708.1, which the Committee asserted will promote due process in prerevocation procedure by establishing the options a supervising authority has when the authority believes a county probationer violated the technical terms of probation; criteria for lodging a detainer if needed to detain the probationer until the revocation hearing; a short deadline for judicial review of detainers at the **Gagnon I** hearing to determine if probable cause exists to believe the probationer violated the conditions of probation and if there are any conditions upon which a probationer may be released; and automatic expiration of the detainer if the deadline is not met.  **See id.**  After receiving an initial round of comments, the Committee revised the proposed rules and republished them for further public comment on July 8, 2023.  **See** 53 Pa. B. 3553, 2023 PA REG TEXT 646961, 7/8/2023. To date, we are not aware of any further action taken on these proposed rule changes.

[24]  For example, section 9771(c)(2) requires the court to "consider the employment status of the defendant" when imposing "a sentence of total confinement following a revocation."  42 Pa.C.S. § 9771(c)(2).  This makes sense with respect to a person who was summoned to a hearing without being detained, but it is unlikely that most people would be able to retain their

*(Footnote Continued Next Page)*

language appears nowhere in the statute. We reiterate that "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include." **Johnson**, 26 A.3d at 1090. To the contrary, Act 44 left untouched a county probation officer's authority to "arrest, with or without warrant, writ, rule or process, any person on probation under the supervision of the court for failing to report as required by the terms of that person's probation … or for any other violation of that person's probation…." 42 Pa.C.S. § 9913. Clayborne's argument notwithstanding, we cannot conclude that the General Assembly intended to change prerevocation procedure without explicit language that it was doing so.[25]

Moreover, there were cases decided prior to the enactment of Act 44 wherein a probationer was either sentenced to a term of incarceration less than his prehearing detention or not resentenced to a term of incarceration at all. **See, e.g., Commonwealth v. Berkhous**, 324 A.3d 1270 (Pa. Super. 2024) (non-precedential decision) (determining that trial court did not err in revoking probationer's probation and resentencing probationer to five years of probation with restrictive conditions despite probationer's claim that his

_____

employment during a multi-month detention. Nonetheless, it would be a stretch for this Court to interpret this language as a requirement not to detain an individual prior to revocation, particularly as Act 44 says nothing about prehearing detention for probationers accused of technical violations.

[25] This may be an area that our Supreme Court's Criminal Procedural Rules Committee should investigate further.

speedy hearing rights were violated, inter alia, by unnecessarily incarcerating him for sixty-five days between expiration of his original probationary period and **Gagnon II** hearing). In other words, it is not a new phenomenon that prehearing detention may exceed the post-revocation sentence, making our General Assembly's silence on this question all the more compelling.

Turning to Clayborne's rather sparse due process claim, we reach a similar conclusion based upon the argument he presents. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." **Mathews v. Eldridge**, 424 U.S. 319, 333 (1976). Although a probationer's liberty is "conditional" and "dependent upon observance" of restrictions, its loss is a "serious deprivation" warranting due process. **See Gagnon**, 411 U.S. at 781 (quoting **Morrissey v. Brewer**, 408 U.S. 471 (1972), and holding that revocation of probation requires the same due process as afforded to alleged parole violators described in **Morrissey**); **Commonwealth v. Davis**, 336 A.2d 616, 621 (Pa. Super. 1975) (describing the procedural due process rights outlined in **Morrissey** and **Gagnon**).

Neither **Morrissey** nor **Gagnon** prescribe specific timeframes for the two-hearing procedure. **Morrissey** indicates that the first hearing should occur "as promptly as convenient after arrest while information is fresh and sources are available," and the second hearing "must be tendered in a reasonable time after the parolee is taken into custody" and suggests that two months is not unreasonable. **Morrissey**, 408 U.S. at 488. This Court has

previously described the speedy trial right in Rule 1409, the predecessor to Rule 708, as "part of due process." *See Commonwealth v. Jones*, 364 A.2d 414, 416 (Pa. Super. 1976).

Clayborne does not argue that any additional process beyond Rule 708 is due a probationer. Instead, he argues that delaying the "revocation hearing until he had served multiple terms of the maximum possible sentence deprived [him] of a hearing at a meaningful time." Clayborne's Brief at 42-43. Notably, he does not contend that the detention itself violates due process. Like his argument pertaining to Rule 708, he premises his claim on the notion that the General Assembly's restriction of the trial court's sentencing authority post-revocation means that the General Assembly also intended to restrict prerevocation detainers. As explained above, while logical, and perhaps aligned with the policy driving Act 44, this argument presumes too much. Based upon the claim raised before this Court, Clayborne has not established an infringement upon his right to due process in the revocation of his probation.

## Issue 3: Entitlement to Credit for Time Served

### Arguments of the Parties and Trial Court's Rationale

In his final issue, Clayborne argues that the trial court erred by declining to award him credit for the time he spent in custody on the probation detainer when resentencing him following the revocation of his probation in the 2020 case. Clayborne's Brief at 58-66. From his perspective, 42 Pa.C.S. § 9760

unambiguously required the court to award credit for time he spent in custody on any probation violation detainer in the same case upon resentencing. Clayborne's Brief at 58-61. He argues that amendments to section 9771 by Act 44 did not impact the section 9760 time credit analysis. *See id.* at 59-60, 65-66. According to Clayborne, by assuming that all technical violators will be detained prior to revocation when no law requires prerevocation detention, the trial court manufactured a conflict between sections 9760 and 9771. *Id.* at 61-62. He asserts that a probationer's continued incarceration for evaluation under section 9771(c)(2)(iv) is not mandatory, and the court could simply direct the probationer to comply with an evaluation as part of the sentence. *Id.* at 63. It also could expedite the revocation hearing process, thereby leaving time for post-revocation evaluations. *Id.* at 62. That the interplay between section 9760 and 9771 produces a result that is impractical or inconsistent with standard procedure in Delaware County does not permit the trial court to ignore the plain language of section 9760. *Id.* at 64-66.

The trial court reasoned that if section 9760(1) required it to give credit for time served, "it would be impossible to use the 30-day period of incarceration to which [Clayborne] was sentenced to ensure completion of necessary evaluations as contemplated by 42 Pa. C.S. § 9771(c)(2)(iv)." Trial Court Opinion, 12/17/2024, at 13. According to the trial court, the legislative history of section 9771 "reveals no acknowledgment, consideration, or discussion of either the interplay between 42 Pa.[]C.S. §§ 9760 and 9771 or

the inevitable time lapse between a defendant's detention and subsequent revocation hearing." Trial Court Opinion, 12/17/2024, at 13. Because the time spent detained prerevocation would exceed the fourteen-day statutory sentence and the thirty-day period afforded for evaluations as a matter of course, applying time credit would entitle the defendant to release before the trial court could utilize the tools the General Assembly intended for it to have post-revocation. *Id.* at 13-14. A defendant who fails to complete the evaluations in the community as ordered will receive another technical violation and will have banked time served to be applied towards future technical violations, leading to an "absurd" and "never-ending probation cycle" that is the opposite of what the General Assembly intended to accomplish with Act 44. *Id.* at 14. Because the court must presume that the General Assembly did not intend an absurd result, it concluded that the General Assembly did not intend for a probation violator to receive prerevocation time credit upon resentencing. *Id.* at 13-14.

The Commonwealth agrees with the trial court that there is "arguably" a conflict between sections 9760(1) and 9771(c)(2)(iv), which permitted the trial court to evaluate legislative intent. Commonwealth's Brief at 24. To achieve the purpose of the sentencing scheme set forth in section 9771(c), including the ability to incarcerate when necessary to evaluate the defendant, the Commonwealth argues that the trial court "was constrained to not award [Clayborne] the credit time." *Id.* at 23.

<u>Analysis</u>

A challenge to the trial court's failure to award credit for time served prior to sentencing involves the legality of a sentence, which is a question of law that we review de novo with a plenary scope of review. ***Commonwealth v. Johnson***, 967 A.2d 1001, 1003 (Pa. Super. 2009).

There is no constitutional right to credit for time served prior to trial or sentence. ***Martin v. Bd. of Prob. & Parole***, 840 A.2d 299, 304 (Pa. 2003). The right to time credit stems from section 9760 of the Sentencing Code's general provisions regarding a trial court's imposition of sentence in a criminal matter. The purpose of section 9760 is twofold: "(1) eliminating the unequal treatment suffered by indigent defendants who, because of their inability to post bail, may serve a longer overall confinement for a given offense than their wealthier counterparts; and (2) equalizing the actual time served in custody by defendants convicted of the same offense." ***Id.*** at 309. The relevant provision states:

> After reviewing the information submitted under section 9737 (relating to report of outstanding charges and sentences) the court shall give credit as follows:
>
> (1) Credit against the maximum term and any minimum term shall be given to the defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based. Credit shall include credit for time spent in custody prior to trial, during trial, pending sentence, and pending the resolution of an appeal.

42 Pa.C.S. § 9760(1).

From its plain language, application of time credit pursuant to 9760 involves two inquiries: (1) what is the "time spent in custody" for which time credit is due and (2) what is the "prison sentence" against which time credit must be awarded. Both Clayborne and the Commonwealth agree that under the prior version of section 9771, section 9760 time credit may be awarded against a resentence to a period of incarceration after revocation of probation. **See** Clayborne's Brief at 58-59; Commonwealth's Brief at 23; **see also** **Phillips**, 344 A.3d at 368-69 (recognizing section 9760 as encompassing a probation detainer as one of the causes of "time spent in custody" for which time credit may be awarded).[26]

Our decision in **Johnson** is instructive. Johnson was convicted of PWID and sentenced to a term of probation. He was subsequently found in technical violation of his probation for missing curfew. When resentencing Johnson on the PWID conviction, the trial court refused to credit Johnson for the time he had spent incarcerated on the probation violation detainer prior to revocation, as well as the time he had spent detained prior to pleading guilty to PWID originally. **Johnson**, 967 A.2d at 1002-04.

---

[26] The law is clear, however, that a probationer is not entitled to credit for time served on probation. **See Commonwealth v. Crump**, 995 A.2d 1280, 1284 (Pa. Super. 2010) (construing sections 9760(1) and 9771(b) and concluding that a trial court is not required to award time for time spent on probation because section 9760 provides credit only for "time spent in custody" and section 9771(b) requires trial courts to give "due consideration" at resentencing to the time serving probation but does not mandate awarding credit for such time).

On appeal, a divided panel of this Court reversed. Noting that section 9760 did not directly address time credit in this situation, the majority held that the plain language of section 9760(1)—"all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based"—was broad enough to encompass both periods requested by Johnson upon resentencing. *Id.* at 1004-06. This Court reasoned that upon revocation, the probationer's original sentence becomes a legal nullity, and the probationer is "placed in the same position that he was in at the time of his original conviction." *Id.* (citing ***Commonwealth v. Pierce***, 441 A.2d 1218, 1220 (Pa. 1982)). Because section 9760(1) would have required the court to credit Johnson with time served prior to sentencing if it had incarcerated Johnson originally, we determined that section 9760(1) likewise required the trial court to credit Johnson with all time served prior to resentencing. *Id.* at 1006.

Thus, according to ***Johnson*** the period for which time credit was due, i.e., "all time spent in custody," included the time he was incarcerated on the probation violation detainer; that this time spent in custody was "a result of the criminal charge," i.e., the original PWID charge for which probation had been imposed; the PWID charge was "the criminal charge for which a prison sentence is imposed," i.e., the resentencing upon revocation of probation; and the "prison sentence" against which the credit was due was the "maximum

term and any minimum term" imposed for PWID at resentencing following the probation revocation.

If section 9760 applies to the new version of section 9771, the same analysis would follow. The "time spent in custody" for which credit is due is Clayborne's time confined on the probation violation detainer. This custody time is "a result of" the original PWID charge for which probation had been imposed because if Clayborne had not committed PWID, he would not have had probation conditions imposed. As this is a revocation matter, the original PWID charge is also "the criminal charge for which a prison sentence is imposed," i.e., the resentencing upon revocation of probation. The "prison sentence" against which the credit was due was the "maximum term and any minimum term" imposed for PWID at resentencing following the probation revocation.

Thus, we must determine whether section 9760 applies to revised section 9771. As with prior versions of the statute, the current amended version of section 9771(b) provides that upon revocation, "the sentencing alternatives available to the court shall be the same as were available at the time of initial sentencing, due consideration being given to the time spent serving the order of probation." **Compare** 42 Pa.C.S. § 9771(b) (effective until June 10, 2024) **with id.** (effective June 11, 2024 to Oct. 19, 2025).

This language underpins **Johnson**'s rationale that there is no significant distinction between a sentence and a resentence in terms of credit for pretrial

time served because revocation returns a probationer to the same sentencing position that he was in at the time of the original conviction. Although *Johnson* did not cite this statutory language directly in support of its rationale, it relied on, inter alia, our Supreme Court's decision addressing double jeopardy in *Pierce*, which was premised upon this language. *See Johnson*, 967 A.2d at 1006 (citing *Pierce*, 441 A.2d at 1220). *Pierce* explained that imposing a sentence of total confinement upon revocation of probation is an integral element of the original conditional sentence, not a second punishment for the original conviction, because the same section that authorized a trial court to revoke probation also authorized it to impose the "same sentencing alternatives that it had at the time of the original sentencing." *Pierce*, 441 A.2d at 1220 (interpreting section 9771(b)'s predecessor, section 1371(b), and section 9721(a)'s predecessor, section 1321(a)); *see also Commonwealth v. Wallace*, 870 A.2d 838, 842-43 (Pa. 2005) (citing section 9771 and *Pierce* for the proposition that "at any revocation of probation hearing, the court is [] free to impose any sentence permitted under the Sentencing Code").

Importantly for our purposes, the restoration of the original sentencing authority in section 9771(b) was then, as it is now, "statutorily circumscribed" by the requirement in section 9771(c) that the court make certain findings before ordering "total confinement following a violation of probation." *Commonwealth v. Mazzetti*, 44 A.3d 58, 66 (Pa. 2012) (quoting prior

version of 42 Pa.C.S. § 9771(c)(1)-(3)). This remains true in the amended version of section 9771(b), except that the General Assembly made subsection (c)'s statutory circumscription of subsection (b) express. **See** 42 Pa.C.S. § 9771(b) ("**Subject to the limitations of subsections (b.1) and (c)**, upon revocation the sentencing alternatives available to the court shall be the same as were available at the time of initial sentencing, due consideration being given to the time spent serving the order of probation.") (emphasis added). Although the General Assembly may have further restrained the trial court's authority to impose a given sentence, it did not eliminate it. Because section 9771 continues to permit the trial court to impose the same sentencing alternatives available at the time of the original sentencing proceeding, it must abide by the Sentencing Code's subchapters anew when resentencing, as our Supreme Court recognized in **Pierce** and **Wallace**, unless the statutory provisions specify otherwise. This includes awarding a probationer credit for time served while incarcerated on a probation detainer pursuant to section 9760.

We do not perceive any ambiguity in section 9771 as it pertains to the applicability of the Sentencing Code upon resentencing a probationer. To the extent the wording is in any way ambiguous, however, the law is clear that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." 1 Pa.C.S. § 1922(4);

*see also Green*, 291 A.3d at 330 ("In the absence of ambiguity, we cannot apply the presumptions of Section 1922 of the Statutory Construction Act to allow for exceptions to [a non-ambiguous] time limit."). In fact, as our Supreme Court has observed, it is

> [o]ne of the most venerable and fundamental tenets of statutory interpretation [] that, whenever our Court has interpreted the language of a statute, and the General Assembly subsequently amends or reenacts that statute without changing that language, it must be presumed that the General Assembly intends that our Court's interpretation become part of the subsequent legislative enactment.

*Verizon Pennsylvania, Inc. v. Commonwealth*, 127 A.3d 745, 757 (Pa. 2015) (citations omitted). The General Assembly was aware of *Pierce* and *Wallace* interpreting the operative language of section 9771(b) as requiring a court to resentence a defendant pursuant to the provisions of the Sentencing Code following the revocation of probation. This would necessarily include credit for time served as required by section 9760. When it enacted Act 44, that language of section 9771(b) remained unchanged. As such, a probationer resentenced to a period of incarceration following the revocation of probation is entitled to credit for time served, if any, pursuant to section 9760.

Unlike the trial court, we do not perceive a conflict between sections 9760(1) and 9771(c)(2)(iv). Section 9760(1) addresses the time credit owed when imposing a sentence. Section 9771(c)(2)(iv) eliminates "the time limitations contained in this paragraph," i.e., the maximum periods of incarceration for first and second technical offenders, and only "to the extent

- 60 -

that" up to thirty days are needed for evaluations or to participate in court-ordered treatment programs or problem-solving courts. Nothing in the plain language of either section inherently contradicts the other or suggests that prerevocation time credit is not applicable pursuant to the plain language of section 9760.

As we discussed in our analysis of Clayborne's second issue, the limitation on incarceration for a technical probation violation in Act 44 addresses only who may be incarcerated and the length of a permissible sentence of incarceration. It does not address or change the probation officer's "authority throughout this Commonwealth to arrest, with or without warrant, writ, rule or process, any person on probation … under the supervision of the court … for any other violation of that person's probation…." 42 Pa.C.S. § 9913. Just as we cannot presume that the General Assembly intended to change prerevocation procedures in Act 44 without explicit language that it was doing so for purposes of Clayborne's speedy hearing analysis, we cannot presume that the General Assembly intended for a resentencing court to disregard the mandates of section 9760. We are not empowered to ignore the plain language of sections 9760(1) and 9771(c) in service of a statute that the trial court believes that the General Assembly intended to (but did not) write.

Nor do we agree with the trial court's conclusion that awarding credit for time served on a probation detainer following a sentence of incarceration for

a first technical violation is "absurd." As stated above, there is nothing ambiguous in the language of section 9771 as it pertains to the applicability of the Sentencing Code upon resentencing a probationer. *See Green*, 291 A.3d at 330. Even if there was an ambiguity, what is absurd to the trial court may not be absurd to our General Assembly, which is tasked with the consideration and balancing of competing policy considerations. *See Commonwealth v. Peck*, 242 A.3d 1274, 1286 (Pa. 2020) (Wecht, J., concurring) ("Where the criminal laws are concerned, courts should disabuse themselves of the notion that a consequence is unintended, and thus 'absurd,' merely because it is not maximally punitive. Otherwise, judges may be tempted to misapply the absurdity doctrine and disregard the plain meaning of a law in pursuit of its hidden 'spirit.'"). As Clayborne aptly points out, the trial court's absurdity analysis presumes that a probationer will be detained in every case, but the law does not require pretrial detention for a technical violation of probation. *See* Clayborne's Brief at 61-62.

We therefore conclude that the trial court erred by not awarding credit against the maximum term and any minimum term imposed for PWID for the prerevocation time spent in custody as a result of the probation detainer lodged against Clayborne as he awaited a revocation hearing. Because Clayborne apparently has served the total confinement portion of his August 9, 2024 resentence, however, this issue appears to be moot. *See Phillips*, 344 A.3d at 370 n.12 (if an offender has completed his sentence, it "effectively

bars the lower court from providing relief in the form of the credit for time served").  While we are able to review his issue because it is capable of repetition but evading review, and thus presents an exception to the mootness doctrine, *see supra* p. 17-18, we are unable to afford him relief.  As such, we are constrained to affirm his judgment of sentence.

**Conclusion**

In light of Act 44's amendments to the Sentencing Code, we conclude that the trial court correctly found that Clayborne's conduct at Conewago Snyder constituted "assaultive behavior" such that the trial court permissibly sentenced him to a period of incarceration for his first technical violation of probation.  Because nothing in the plain language of Act 44 addresses detainment while awaiting a revocation hearing, we conclude that Clayborne's due process right to a hearing at a meaningful time and his right to a speedy revocation hearing were not violated by conducting the revocation hearing seventy-nine days after he was detained on a bench warrant.  The trial court erred, however, by failing to award him credit for time served during his incarceration on the prehearing detainer.  As Clayborne appears to have completed his resentence, the time credit issue is moot.  Therefore, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/27/2026